1
2
3            **UNITED STATES DISTRICT COURT**
4                   **DISTRICT OF NEVADA**
5    JOSE IRAEL ALVAREZ,                    Case No. 3:15-cv-00363-RCJ-CSD
6                            Petitioner,
7         v.                                           **ORDER**
8    BRIAN WILLIAMS,[1] *et al.*,
9                            Respondents.

10        Petitioner Jose Irael Alvarez filed a petition under 28 U.S.C. § 2254 (ECF No. 34)

11   ("Petition" or "Second Amended Petition"). This Court previously dismissed the Petition as

12   untimely. (ECF No. 49.) This matter is before the Court on an order, from the United States Court

13   of Appeals for the Ninth Circuit, reversing and remanding Grounds 2, 4, and 5 of the Petition after

14   finding them timely. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550 (9th Cir. Oct. 21, 2021).

15   For the reasons discussed below, Ground 2 will be denied, Grounds 4 and 5 will be dismissed as

16   procedurally defaulted, and the Petition and a Certificate of Appealability will be denied.

17   **I.    FACTUAL BACKGROUND[2]**

18        **A.    Alvarez agreed to supply methamphetamine to an informant.**

19        Detective Orlando Guerra of the Nevada Department of Public Safety, Investigation

20   Division, was assigned to the North Central Narcotics Task Force when he arrested Eric Kelly in

21   Fallon, Nevada, for trafficking in methamphetamine after Kelly made controlled sales to a police

22

23        [1] According to the state corrections department's inmate locator page, Alvarez is incarcerated at High Desert
24   State Prison. The department's website reflects Brian Williams is the warden for that facility. *See* HDSP_Facility
     (nv.gov). The Court will therefore direct the Clerk of the Court to substitute Brian Williams for Respondent Dwight
25   Nevens, under, *inter alia,* Fed. R. Civ. P. 25(d).

26        [2] The Court summarizes the relevant state court record for consideration of the issues. The Court makes no
     credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state
27   court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact
     made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Any
28   absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the
     evidence in considering the claims.

                                                              1

informant, and police executed a search warrant at Kelly's residence. (ECF No. 76-10 at 6, 22.) Kelly pleaded guilty to methamphetamine trafficking, and with the hope of avoiding imprisonment, agreed to provide substantial assistance in the apprehension of his methamphetamine supplier in California, whom he knew as "Jose." (ECF No. 76-9 at 55, 64–65.) Kelly saw Jose on 20 occasions during the course of four or five years and did not know Jose's last name. (*Id.* at 60.) At trial, Kelly identified Alvarez as "Jose." (*Id.*)

Detective Guerra testified he had Kelly record an outgoing voicemail message on Guerra's work cellular telephone so that Kelly could conduct calls with Alvarez using Guerra's phone while Guerra monitored the calls. (ECF No. 76-10 at 6–7, 32.) Kelly testified he used Guerra's phone on August 20, 2009, to call Alvarez, told him he had "7000 racks," which meant $7,000, to pay Alvarez to supply him with "a lot" of methamphetamine, plus money Kelly owed Alvarez. (ECF No. 76-9 at 55–57, 61.) Kelly said Alvarez told him he would head to Nevada and Alvarez later confirmed he would call Kelly when he arrived in Reno, Nevada. (*Id.*) The next morning, Alvarez told Kelly he was at Circus Circus. (*Id.* at 58.) Kelly said he asked Alvarez if he "brought enough" and Alvarez told him he "brought a whole one," which, according to Kelly, meant "a pound" of methamphetamine. (*Id.*) Guerra testified he overheard the conversations between Kelly and Alvarez, and overheard Alvarez tell Kelly he was at Circus Circus, would leave as soon as he got his kids together, and was bringing Kelly "a whole one." (ECF No. 76-10 at 8.) Guerra moreover testified his phone received a voice mail message for Kelly from Alvarez and a text message from Alvarez's phone number stating "OMW," meaning "on my way." (*Id.* at 7.) Kelly said he told Alvarez to meet him at room #135 at the Budget Inn in Fallon, Nevada. (ECF No. 76-9 at 59.) Kelly told police he expected Alvarez to arrive in a silver Chevy Tahoe with dealer plates. (*Id.* at 62.) Guerra testified he was aware that Alvarez was in the business of buying and selling vehicles. (ECF No. 76-10 at 23.)

In anticipation of Alvarez's arrival at the motel, Guerra organized a take-down team with the Churchill County Sheriff's Office, the Fallon Police Department, and the North Central Narcotics Task Force. (*Id.* at 8.) The Task Force rented the motel room and Guerra obtained an anticipatory warrant to arrest Alvarez and search Alvarez's vehicle. (*Id.*) A perimeter of 6 law

enforcement officers in vehicles was set up around the motel to await Alvarez's arrival in case Alvarez fled. (*Id.* at 9.) Detective Guerra, along with Captain John Haugen and Undersheriff James T. Wood of the Churchill County Sheriff's Office, were parked in unmarked vehicles equipped with lights and sirens. (ECF Nos. 76-10 at 9; 76-11 at 14, 59.) Fallon Police Department Officer Duane Jardine and Deputy Sheriff Jared Jones waited in marked vehicles. (ECF No. 76-10 at 46, 51.) Guerra testified Kelly was stationed in a vehicle about 80 yards from the motel parking lot so he could provide visual confirmation when Alvarez arrived. (*Id.* at 9.) Detective Sergeant Aramis Paul Pabon with the Nevada Department of Public Safety, Investigation Division, sat with Kelly in the vehicle surveilling the motel for Alvarez's arrival. (*Id.* at 38.) Pabon testified Kelly received several phone calls from Alvarez during their wait. (*Id.*) Kelly and Pabon said that when they saw a gold-colored Honda Acura arrive near the motel room, Pabon handed his binoculars to Kelly, who looked through them and confirmed his supplier, Alvarez, was in the Acura, and Pabon heard Alvarez honk for the occupant of the motel room. (ECF Nos. 76-9 at 59, 62; 76-10 at 38, 40.)

**B.     Alvarez fled when police attempted to stop him from leaving the motel.**

When Detective Guerra received Kelly's confirmation that Alvarez arrived at the motel, he gave the predetermined takedown signal, and Deputy Jones drove to the motel followed by Officer Jardine and Guerra, each activating their lights and sirens once they were inside the motel parking lot. (ECF No. 76-10 at 9–11.) According to Guerra, Jones drove his vehicle to meet Alvarez's vehicle, which turned out to be a gold Honda Acura SUV, "parked just a couple of rows over from [room] 135," and Jardine went "in at an angle" to Jones to block Alvarez's escape, while Guerra went "in at another angle to" Jardine. (*Id.*) Guerra said the Acura backed up and moved away from Jones's vehicle even though Guerra, Jones, and Jardine, had activated lights and sirens. (*Id.*)

Officer Jardine testified he initiated his lights and dashboard video camera[3] after he entered the motel parking lot and saw Alvarez's gold SUV vehicle parked in front of room 135. (*Id.* at 51, 56.) Jardine said he pulled his vehicle up at an angle "towards the driver's side," parked, exited his vehicle, and then Alvarez's vehicle "charged" and "sideswiped" Jardine's vehicle. (*Id.* at 51–52,

---

[3] Excerpts from the dashboard camera recordings from Jones and Jardine's vehicles were played for the jury. (ECF No. 76-10 at 43–44, 52–55.)

57.) Jardine thought he was going to be "seriously injured or killed" and jumped back into his vehicle before Alvarez's vehicle hit the side of Jardine's vehicle. (*Id.*) Jardine said the molding on his car door struck his knee and his knee hurt but he was not injured. (*Id.*)

Deputy Jones testified he was assigned to conduct the initial stop of Alvarez and turned on his dashboard videotape recorder when he received the "go command" from Guerra. (*Id.* at 43–44, 47.) Jones said he pulled into the motel parking lot and saw Alvarez in the driver seat of the parked Acura. (*Id.* at 44–45, 49.) Jones exited his vehicle, drew his weapon for officer safety, and advised Alvarez to stop and show his hands, but Alvarez was "already backing up." (*Id.* at 45–46, 49.) Jones said he saw Alvarez's vehicle stop momentarily and then move forward to the left, hit Jardine's vehicle on the door and front fender, hit the "front right" of Detective Guerra's vehicle, and depart the parking lot. (*Id.*)

### C.     Police chased Alvarez's vehicle.

Undersheriff Wood testified that, as soon as Alvarez fled the motel parking lot, Wood caught up to him, they made eye contact, and Wood chased after Alvarez with activated lights and siren. (ECF No. 76-10 at 60.) Captain Haugen also gave chase, with activated lights and siren, following Wood's vehicle northbound on Dalton Street. (ECF No. 76-11 at 15–16.) Carlene Tucker testified she lived on Dalton Street and was returning from Walmart on Grimes Street, less than a block from her home, when a car sped past her travelling into the opposite lane of traffic, at about 45 or 55 miles-per-hour in a 25 mile-per-hour-zone, followed by two police cars with flashing lights. (*Id.* at 8–9.) She said the vehicles "sped" up her driveway, and the first vehicle travelled across her property into the next-door parking lot of a fourplex, which had a blocked exit, and then drove across her lawn and exited the other end of her driveway. (*Id.*)

Undersheriff Wood testified he followed Alvarez's vehicle up the Tucker driveway and stopped when Alvarez drove onto an adjacent parking lot for an apartment complex. (ECF No. 76-10 at 61.) Wood said he was uniformed, had his lights on, and thought "it was over because [Alvarez] was on a dead end," so Wood partially exited his vehicle and yelled for Alvarez to "stop," but Alvarez only stopped a second and then "took off down the driveway" of the apartment complex back toward the street. (*Id.* at 62.) Wood said Alvarez's vehicle collided with Captain

Haugun's vehicle, travelled across the Tucker lawn, exited the north driveway, and headed up Dalton Street. (*Id.* at 63–64.) Wood and Haugun followed Alvarez's vehicle until Alvarez stopped at Gold Miner Jeweler. (ECF Nos. 76-10 at 64; 76-11 at 16.)

**D.      Alvarez's vehicle contained 4 children, a mobile phone, but no drugs.**

Detective Guerra testified he arrived on the scene when Alvarez stopped at the Gold Miner Jeweler, exited his vehicle, and that Alvarez put his hands up as ordered. (ECF No. 76-10 at 13–14.) Guerra said Alvarez could not open his vehicle door because of the collision damage so Guerra and Officer Jardine pulled Alvarez out of the vehicle. (*Id.*) Jardine testified that, due to the collision damage to his vehicle, he had to kick open his vehicle door to exit and assist Guerra in pulling Alvarez out of the Acura. (*Id.* at 52.) Guerra testified he heard kids screaming and discovered in the vehicle four female children ranging in age from 1 to 13 years old and an adult female. (*Id.* at 14.) After the passengers were secured, Guerra searched Alvarez's vehicle, and although he did not find any controlled substances, he found a Boost Mobile phone in the driver's console area, which listed a recent call to Guerra's work cell phone number—the same number Kelly had used to contact his supplier "Jose." (*Id.* at 14–16.)

**E.      Police found a line of methamphetamine along the Tucker driveway.**

Captain Haugen testified that after he arrived at the Gold Miner parking lot where Alvarez was apprehended, he realized he lost his radio, so he asked Deputy Lewy of the Churchill County Sheriff's Department to return to the scene of his collision with Alvarez because he believed he lost it when he jumped out of his vehicle. (ECF No. 76-11 at 16–17.) Deputy Kevin Johnson testified he accompanied Lewy about a half hour after Alvarez was arrested, and that after they viewed the collision scene in the apartment complex driveway, they checked the Tucker yard where they found a line of suspected methamphetamine. (*Id.* at 4–6.) Deputy Lewy approximated the line of "white material in the dirt, along the north edge of the [Tucker] driveway" ran for about 89-feet across the Tucker property to the apartment complex driveway. (ECF No. 76-10 at 72–73, 75–76, 79.) Tucker testified that after "everybody was out" following the chase onto her property, she noticed white "stuff" on the ground in her driveway, and it was not present when she left to run errands earlier that day. (ECF No. 76-11 at 11–13.) Detective Guerra testified the "white trail"

of suspected methamphetamine, started "just inside the [left side of the Tucker] driveway, led up all the way to the top portion" to the "small car port at the top of the driveway," that is attached to the house. (ECF No. 76-10 at 16.) Guerra, along with several other officers and deputies, collected the substance by hand, which, including the bag they placed the substance into, grossly weighed about "432 grams, 16 grams shy of one pound." (*Id.* at 18–19.) Guerra said the substance tested presumptively positive for methamphetamine. (*Id.* at 19, 30–31.)

Undersheriff Wood testified he could not have seen Alvarez deposit the methamphetamine for the first "hundred feet or so" up the Tucker driveway off Dalton when he was chasing Alvarez's vehicle there because Wood was four, five car lengths back and he was perpendicular to Alvarez's car when Alvarez turned into the Tucker driveway. (*Id.* at 67–68.) Wood said he did not see white crystal all along that driveway because he was not looking at the ground. (*Id.*) Wood said he returned to the driveway on Dalton and saw that the line of suspected methamphetamine went up the driveway where Alvarez had driven his vehicle for about "40, 50 feet." (*Id.* at 66, 68.)

Diane Machen testified she was employed with the Washoe County Sheriff's Office, Forensic Science Division, Chemistry Section. (*Id.* at 35.) The North Central Narcotics Task Force asked her to analyze suspected methamphetamine, weighing 422.92 grams, which included "small amounts of" apparent debris (leaf and dirt materials) "relative to the crystalline substance." (*Id.* at 36–37.) The crystalline substance tested positive as methamphetamine. (*Id.*) Because it was infeasible to separate the debris, Machen was unable to discern the precise weight of the methamphetamine component of the sample, but testified that if the debris was separated, "the crystalline substance would still weigh more than 28.0 grams." (*Id.*)

## II.   PROCEDURAL BACKGROUND

The jury acquitted Alvarez of Count 11, which alleged that he assaulted Detective Guerra with his motor vehicle, but convicted him of the remaining felony charges, including (1) trafficking in a controlled substance (28 grams or more); (2) four counts of allowing a child to be present during commission of certain violations which involve controlled substances other than marijuana; (3) failure to stop on signal of peace officer causing property damage; (4) offer, attempt or commission of unauthorized act relating to a controlled or counterfeit substance; (5) two counts of

battery with a deadly weapon; and (6) one count of assault with a deadly weapon. (ECF No. 14-7.) The jury furthermore convicted Alvarez of four gross misdemeanors for abuse, neglect, or endangerment of a child, not causing substantial bodily harm. (*Id.*) Alvarez is sentenced to 19 years and 1 month to life imprisonment. (ECF No. 76-15.) Alvarez appealed and the Supreme Court of Nevada affirmed Alvarez's convictions. (ECF Nos. 15-8; 15-26; 15-33.)

Alvarez filed a handwritten *pro se* postconviction petition for writ of habeas corpus in the state district court. (ECF No. 16-5.) Counsel was appointed and filed a supplemental petition. (ECF No. 16-31.) The state district court held an evidentiary hearing and denied the petition. (ECF Nos. 17-6; 17-7.) Alvarez appealed and new counsel was appointed for the appeal. (ECF No. 17-30.) Alvarez's postconviction appellate counsel intentionally omitted from the opening brief on appeal all of the claims raised in Alvarez's postconviction petitions brought before the state district court and instead purported to raise two new claims of ineffective assistance of appellate counsel. (*Id.* at 22–26.) The Supreme Court of Nevada declined to consider the claims because it concluded the claims were not first presented to the state district court. (ECF No. 17-33.)

Alvarez filed a *pro se* federal petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 6 ("original petition")). With this Court's permission Alvarez filed an amended petition. (ECF No. 24.) The Court subsequently appointed counsel who filed the operative Second Amended Petition. (ECF No. 34.) Respondents moved to dismiss the Petition claiming it was untimely as Grounds 1–5 do not relate back to the timely-filed original petition, and Grounds 2, 3, 4, and 5 are unexhausted. (ECF No. 41.) This Court did not reach the exhaustion analysis because it concluded all five grounds of the Petition do not relate back to the timely-filed original petition and dismissed the Petition as untimely. (ECF No. at 49 at 1.)

Alvarez appealed and the United States Court of Appeals for the Ninth Circuit granted a certificate of appealability for the issue: "[W]hether the district court properly concluded that [Alvarez's] claims 2, 4, and 5 in his second amended petition did not relate back to claims in his originally filed petition and thus were time-barred." (ECF No. 54.) A Ninth Circuit panel issued a memorandum opinion reversing the Court's final order denying habeas relief and remanding the case for additional proceedings. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550 (9th Cir. Oct.

21, 2021). The Ninth Circuit panel determined that when the Court issued its order dismissing the Petition, it did not have the benefit of *Ross v. Williams*, 950 F.3d 1160 (9th Cir. 2020) (*en banc*), which held that "[i]f a petitioner attempts to set out habeas claims by identifying specific grounds for relief in an original petition and attaching a court decision that provides greater detail about the facts supporting those claims, that petition can support an amended petition's relation back." *Id.* at 1 (citing *Ross*, 950 F.3d at 1167). A majority of the Circuit panel decided that Grounds 2, 4 and 5 are timely because they "relate back to the claims in the original petition" when the exhibits that Alvarez attached to the original petition are considered part of Alvarez's original petition, because they share a common core of operative facts with claims that Alvarez attempted to set out in his original petition. *Id.* at 1–2. After remand, Respondents filed an answer addressing Grounds 1, 2, 4, and 5 of the Petition (ECF No. 67) and Alvarez submitted a reply. (ECF No. 74).[4]

## III.   LEGAL STANDARDS

### A.   Effective Assistance of Counsel

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that,

---

[4] The Court will not address Ground 1 of the Petition, which alleges Alvarez was denied due process of law under the Fourteenth Amendment because the State presented insufficient evidence to support his conviction for trafficking in a controlled substance. (ECF No. 34 at 10–13.) The Court previously entered an order and judgment dismissing Ground 1 as untimely, and Ground 1 was not entertained on appeal. Therefore, the Ninth Circuit panel's order reversing and remanding this matter did not include Ground 1 as a remanded claim. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550 (9th Cir. Oct. 21, 2021). The parties agreed in their joint status report that the case should be briefed "on the merits of the remanded claims" and the answering brief itself indicates an intention to answer "Grounds 2, 4, and 5 of the second amended petition." (ECF Nos. 62; 67 at 6.) Although Respondents previously asserted and prevailed in their motion to dismiss Ground 1 based on their statute of limitations defense, Respondents, without explanation, included in their answer argument on the merits of Ground 1. (ECF No. 67 at 7–13.) Alvarez contends in his Reply that Respondents affirmatively waived the statute of limitations defense for Ground 1 by addressing it on the merits in their answer. (ECF No. 74 at 7–8.) Respondents made no attempt to respond to the waiver argument, e.g., in a notice of errata or motion for leave to amend the answer, or otherwise explain their answer addressing the merits of Ground 1. *See* 28 U.S.C. § 2243 (State's response to habeas petition may be amended by leave of court). The record nowhere indicates that Respondents' inclusion of argument on the merits for Ground 1 in the answer was a deliberate or intentional relinquishment of the statute of limitations defense for Ground 1 or an attempt to request the Court reconsider its prior judgment dismissing Ground 1. *See*, e.g., *Day v. McDonough*, 547 U.S. 198, 211 (2006) (concluding, *inter alia*, that State's concession of timeliness of petition by miscalculation of limitation period was an "inadvertent error" that did not constitute a waiver of statute of limitations defense as nothing in the record suggested the State "strategically" withheld statute of limitations defense or chose to relinquish it). The record here strongly suggests the Respondents inadvertently addressed Ground 1 in the answer to the Petition. Therefore, the Court will not consider the merits of Ground 1.

but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy either question, the Court need not consider the other. *Id.* at 697.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). In considering an ineffective assistance of counsel ("IAC") claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. A petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* In considering such claims, a court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id.* at 687.

To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must show a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones*

1   *v. Barnes*, 463 U.S. 745 (1983)). The Ninth Circuit Court of Appeals has explained that in applying

2   *Strickland*'s two prongs to a claim of ineffective assistance of appellate counsel:

3           [T]hese two prongs partially overlap . . . In many instances, appellate
        counsel will fail to raise an issue because she foresees little or no likelihood of
4       success on that issue; indeed, the weeding out of weaker issues is widely recognized
        as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will
5       therefore frequently remain above an objective standard of competence (prong one)
        and have caused her client no prejudice (prong two) for the same reason—because
6       she declined to raise a weak issue.

7   *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted). Failure to

8   present a weak issue on appeal neither falls below an objective standard of competence nor causes

9   prejudice for the same reason—the issue had little or no likelihood of success on appeal. *Id.*

10          **B.     Procedural Default**

11          "A federal habeas court generally may consider a state prisoner's claim only if he has first

12  presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 142

13  S. Ct. 1718, 1727 (2022). Where a petitioner has failed to do so and therefore "has defaulted his

14  federal claims in state court pursuant to an independent and adequate state procedural rule," federal

15  habeas review "is barred unless the prisoner can demonstrate cause for the default and actual

16  prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider

17  the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S.

18  722, 750 (1991). To demonstrate cause for a procedural default, a petitioner "must establish that

19  some external and objective factor impeded his efforts to comply with the state's procedural

20  rule." *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999) (citing *Murray v. Carrier,* 477 U.S.

21  478, 488 (1986)). "[T]o establish prejudice, [a petitioner] must show not merely a substantial

22  federal claim, such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the

23  constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Shinn*, 142 S. Ct. at

24  1734–35 (emphasis in original) (citing *Carrier*, 477 U.S. at 494 and quoting *United States v.*

25  *Frady*, 456 U.S. 152, 170 (1982)).

26          For an ineffective assistance of trial counsel claim, a petitioner may overcome cause for a

27  procedural default where (1) the claim of "ineffective assistance of trial counsel" is a "substantial"

28  claim; (2) the "cause" consists of there being "no counsel" or only "ineffective" counsel during

the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012) and relying on *Coleman*, 501 U.S. 722).[5]

An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court cited the standard for issuing a certificate of appealability as an analogous standard for determining whether a claim is substantial. *Id.* According to the certificate of appealability standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. This standard does not require a showing that the claim will succeed; only that its proper disposition could be debated among reasonable jurists. *Id.* at 336–38.

## IV. DISCUSSION

### A. Ground 2

Ground 2 asserts appellate counsel was ineffective for failing to challenge the sufficiency of the evidence for the convictions for four counts of allowing a child to be present during the commission of drug-related offenses.[6] (ECF No. 34 at 13–16.) Respondents reassert Ground 2 is unexhausted, claiming it was not presented to the state district court. (ECF No. 67 at 13–14.) Alvarez contends Ground 2 is exhausted and this Court must conduct *de novo* review because Alvarez presented the claim in his petition for writ of habeas corpus to the state district court and

---

[5] Nevada prisoners must raise IAC claims for the first time in a state petition for postconviction review, which is considered the initial collateral review proceeding. *See Rodney v. Filson,* 916 F.3d 1254, 1259–60 (9th Cir. 2019).

[6] The majority of the Ninth Circuit panel determined this claim is contained in Ground 3 of the original petition. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550 at 2 (9th Cir. Oct. 21, 2021). It determined the facts underlying the claim are set forth in Alvarez's state habeas corpus appellate brief, which addressed the same issue and was attached to the original petition. (*Id.*)

1  to the Supreme Court of Nevada, but the latter court failed to address it after erroneously

2  concluding it was not presented to the state district court. (ECF Nos. 34 at 13; 74 at 15–18.)

3              **1.      Ground 2 is exhausted.**

4         "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

5  state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and

6  correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)

7  (citations and internal quotation marks omitted). "A petitioner fully and fairly presents a claim to

8  the state courts if he presents the claim (1) to the correct forum; (2) through the proper vehicle;

9  and (3) by providing the factual and legal basis for the claim." *Scott v. Schriro*, 567 F.3d 573, 582

10  (9th Cir. 2009) (internal and other citations omitted). "Full and fair presentation additionally

11  requires a petitioner to present the substance of his claim to the state courts, including a reference

12  to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief."

13  *Id.* (citing *Picard v. Connor,* 404 U.S. 270, 278 (1971)).

14         The Supreme Court has interpreted 28 U.S.C. § 2254(c) as requiring a petitioner to give

15  the state courts "a *fair* opportunity to act on their claims" by giving them "one full opportunity to

16  resolve any constitutional issues by invoking one complete round of the State's established

17  appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (emphasis in

18  original). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present'

19  his claim in each appropriate state court (including a state supreme court with powers of

20  discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin,* 541

21  U.S. at 29 (citations omitted); *see also Scott*, 567 F.3d at 582 ("A petitioner satisfies the exhaustion

22  requirement by fully and fairly presenting each claim to the highest state court.").

23         In Alvarez's hand-written state *pro se* petition for writ of habeas corpus filed with the state

24  district court, he raised an ineffective assistance of appellate counsel claim for "failing to raise

25  each" and every one of the violations alleged "herein" and referred to the facts contained in that

26  petition. (ECF No. 16-5 at 7, 42.) One of the claims Alvarez presented in that petition was a

27  substantive claim that insufficient evidence supports his four convictions for allowing a child to

28  be present during the commission of drug-related offenses. (*Id.* at 27–31.) The state district court

first ruled there was no merit to Alvarez's handwritten *pro se* claim that trial counsel was ineffective for failing to move to suppress evidence obtained as a result of an invalid warrant. (ECF No. 17-7 at 8–9.) The state district court next rejected the four claims raised in the counseled supplemental petition. (*Id.* at 9–13.) The state district court thereafter rejected Alvarez's claims that the strategies of trial and appellate counsel affected the outcomes of the trial and appeal, and concluded appellate counsel's representation did not fall below an objectively reasonable performance because "[a]ppellate counsel testified he considered all issues preserved for appeal and presented those issues that had merit." (*Id.* at 13–14.) Thus, the state district court addressed the claims raised in Alvarez's handwritten *pro se* petition and his counseled supplemental petition.

In Alvarez's counseled appeal from the denial of his petition for postconviction relief, Alvarez claimed appellate counsel was ineffective in failing to challenge the sufficiency of the evidence for the four convictions for allowing a child to be present during the commission of drug-related offenses. (ECF No. 17-30 at 25.) Alvarez's postconviction appellate counsel represented to the Supreme Court of Nevada that the claim was new and had not been raised in the state district court. (*Id.* at 26.) The Supreme Court of Nevada declined to consider the claim:

> On appeal from the denial of his petition filed on June 8, 2010, and his supplemental petition, appellate argues that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to support the convictions of allowing a child to be present during commission of certain controlled substance violations, battery with the use of a deadly weapon, and assault with the use of a deadly weapon. Appellant concedes that he did not raise this claim in his petitions below. However, relying on *Hill v. State*, 114 Nev. 169, 178, 953 P.2d 1077, 1084 (1998), he argues that this court should nevertheless consider the merits of his claim in the first instance on appeal because the trial transcripts provide an adequate basis for review and the claim, if successful, would have the effect of invalidating his sentence. We decline to consider his claim of ineffective assistance of appellate counsel because he did not raise it in his proper person post-conviction petition or supplemental petition. *See Davis v. State*, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991), *overruled on other grounds by Means v. State*, 120 Nev. 1001, 1012–13, 103 P.3d 25, 33 (2004). We note that appellant's reliance on *Hill* is misplaced as that case involved a capital petitioner. Accordingly, we conclude that the district court did not err in denying the petition . . . .

(ECF No. 17-33 at 2–3.)

The state-court record demonstrates that, although postconviction appellate counsel stated the claim of ineffective assistance of appellate counsel for failing to challenge the sufficiency of the evidence to support the convictions of allowing a child to be present during commission of

certain controlled substance violations was not raised in the court below, that concession is contradicted by Alvarez's handwritten state *pro se* petition and the state district court's determinations. *See, e.g., Johnson v. Williams*, 568 U.S. 289, 298 (2013) (confirming that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (holding when a state court issues an unreasoned summary order deciding a case on the merits, it is assumed that the court resolved questions necessary to its decision).

Based on the state court record, the Supreme Court of Nevada was afforded a fair opportunity to adjudicate the claim as its erroneous and unreasonable premise for rejecting the claim was apparent from the record that was before that court. *See Scott,* 567 F.3d at 583 ("All exhaustion requires is that the state courts have the opportunity to remedy an error, not that they actually took advantage of the opportunity."); *Williams,* 568 U.S. at 303 ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court,§ 2254 (d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."). Based on the state-court record, Ground 2 is exhausted, the Supreme Court of Nevada overlooked it, and this Court will consider the merits of Ground 2 *de novo*.

### 2.   *De novo* review of Ground 2.

Alvarez was convicted of 4 counts of intentionally allowing his 4 minor daughters to be present in his vehicle at the motel parking lot during his trip to supply in excess of 400 grams of methamphetamine to Kelly, in violation of NRS § 453.3325. (ECF No. 76-15.) The statute under which Alvarez was convicted states in relevant part: "A person shall not intentionally allow a child to be present in any conveyance or upon any premises wherein a controlled substance other than marijuana . . . [i]s being sold, exchanged, bartered, supplied . . . if the person in any manner knowingly engages in or conspires with, aids or abets another person to engage in such activity . . . ." NRS § 453.3325(1)(b). As used in that section, "child" "means a person who is less than 18 years of age" and "conveyance" "means any . . . vehicle . . . ." NRS § 453.3325(4)(a) and (b). "Without more, mere presence in the area where contraband is discovered or mere association with

the person who does control the contraband is insufficient to support a finding of possession." *Lathrop v. State,* 110 Nev. 1135, 1136, 881 P.2d 666, 667 (1994); *Sheriff, Washoe Cnty., v. Steward*, 109 Nev. 831, 836, 858 P.2d 48, 51–52 (1993); *Konold v. Sheriff,* 94 Nev. 289, 290, 579 P.2d 768, 769 (1978) (holding marijuana in a pipe located in a room where several persons were present insufficient by itself to establish constructive possession). However, dominion and control over narcotics, and knowledge of its narcotic character, "[m]ay be shown by circumstantial evidence and reasonably drawn inferences." *Kinsey v. Sheriff*, 87 Nev. 361, 363, 487 P.2d 240, 341 (1971).

On *de novo* review, the Court concludes appellate counsel's performance was neither deficient nor prejudicial under *Strickland* as there is no reasonable probability of success on appeal had appellate counsel challenged the sufficiency of the evidence for the convictions of NRS § 453.3325. The State presented evidence upon which a rational jury could reasonably infer Alvarez had actual or constructive possession of the methamphetamine in the presence of his four minor daughters in his Acura vehicle, and the methamphetamine was being supplied to Kelly with Alvarez's knowledge and intention to assist Kelly in his intention to sell it to others.[7] Kelly identified Alvarez as his methamphetamine supplier. Kelly and Detective Guerra each testified Alvarez agreed during phone calls with Kelly to supply Kelly with methamphetamine for Kelly to sell to others. Kelly readily identified Alvarez when Alvarez drove up outside the motel room. Although Alvarez appeared in a different vehicle than Kelly expected, Alvarez was in the business of selling and buying vehicles. When three police vehicles, including marked patrol vehicles, with lights and sirens, attempted to stop Alvarez's vehicle in the motel parking lot, Alvarez fled while

---

[7] The Supreme Court of Nevada has not yet interpreted the meaning of "is being sold . . . [or] supplied" as used in NRS § 453.3325(1)(b). "When a statute's language is clear and unambiguous, it must be given its plain meaning . . . ." *D.R. Horton, Inc. v. Eighth Judicial Dist. Court,* 123 Nev. 468, 476, 168 P.3d 731, 737 (2007). "A statute is ambiguous if it is capable of being understood in two or more senses by reasonably well-informed persons." *Id.* "When construing an ambiguous statute, '[t]he meaning of the words used [in the statute] may be determined by examining the context and the spirit of the law or the causes which induced the legislature to enact it.'" *Id.* at 476, 168 P.3d at 737–38 (alterations in original) (quoting *McKay v. Bd. of Supervisors,* 102 Nev. 644, 650–51, 730 P.2d 438, 443 (1986)). The Court concludes the meaning of "is being sold . . . [or] supplied" as used in NRS § 453.3325(1)(b) is clear and unambiguous. Moreover, the legislative history shows the Nevada legislature express its intention to create or increase the penalty for conducting the actions necessary for selling or supplying controlled substances while in the presence of a child and intended targets for the law are individuals involved in the "drug trade." *See* Nevada Assembly Committee Minutes, 4/7/2005.

striking at least one of the vehicles and ignoring commands to stop. Six law enforcement vehicles gave chase with lights and sirens and attempted to stop Alvarez while he evaded capture until after he deposited a line of methamphetamine onto the Tucker property, and that Alvarez stopped only after he distanced himself from the Tucker property. Although Undersheriff Wood, who chased Alvarez onto the Tucker property, did not see Alvarez deposit the methamphetamine in the driveway, Wood was focused on stopping and capturing Alvarez and was not looking at the ground. Once Alvarez was stopped and arrested, police discovered Alvarez's four minor daughters[8] inside Alvarez's Acura vehicle. The line of methamphetamine on the Tucker property corresponded to Alvarez's path of travel on the Tucker property to the adjacent apartment complex's parking lot. Based on the evidence at trial, there is no reasonable probability a challenge to the sufficiency of the evidence for the convictions for violating NRS § 453.3325 would have been successful on appeal and therefore Alvarez fails to establish appellate counsel's failure to raise a sufficiency of evidence claim for the convictions was either deficient or prejudicial under *Strickland.* Alvarez is not entitled to relief for Ground 2.

**B.    Ground 4**

Ground 4 asserts trial counsel was ineffective for failing to move to suppress evidence, including the methamphetamine at the Tucker property and the mobile telephone from Alvarez's vehicle, based on the invalidity of the anticipatory warrant.[9] (ECF No. 34 at 18–20.) Alvarez contends the claim is exhausted because it was presented to each of the state courts, including the state supreme court, but the latter court failed to address it. (*Id.* at 23–24.) Respondents contend this claim is unexhausted because it was not presented to the state supreme court in Alvarez's appeal from the denial of his state postconviction petition. (ECF No. 67 at 14–15, 17.) Respondents further contend that Alvarez cannot overcome the procedural default of Ground 4 under *Martinez*

---

[8] Alvarez's 14-year-old daughter, K.A., testified all four of the children located in Alvarez's vehicle were under 18 years of age at the time. (ECF No. 15-4 at 50.)

[9] The majority of the Ninth Circuit panel held that this claim is contained in Ground 1 of the original petition and the operative facts are described in the state district court's order denying the petition, which is attached to the original petition. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550, at 2 (9th Cir. Oct. 21, 2021).

because he cannot establish postconviction counsel performed deficiently or a substantial claim that Alvarez was prejudiced by trial counsel's failure to move for suppression. (*Id.* at 17–23.)

### 1. Ground 4 is procedurally defaulted.

The state district court denied Alvarez's claim that trial counsel was ineffective in failing to move to suppress evidence based on the invalid warrant. (ECF No. 17-7 at 8–9, 14.) In his appeal from the denial of his state petition, Alvarez did not raise a claim through his appellate counsel, or attempt to raise a *pro se* claim, that trial counsel was ineffective in failing to move to suppress evidence. (ECF No. 17-30 at 3–4.) Although Alvarez claims that he raised the claim by presenting the facts to the state supreme court, his appellate counsel expressly omitted the IAC claim from the appeal. (*Id.* at 22–25.) Accordingly, Ground 4 is unexhausted because the state supreme court was not presented with a fair opportunity to address the claim. *See Baldwin,* 541 U.S. at 29 (noting that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim" and reversing a Ninth Circuit decision holding it was enough that petitioner raised the claim in a lower court whose opinion the state supreme court could read); *see e.g.*, *Custer v. Hill*, 378 F.3d 968, 974–75 (9th Cir. 2004) (holding petitioner failed to exhaust his state remedies where his petition for post-conviction relief included a claim for ineffective assistance of counsel but neither petitioner nor postconviction counsel included the claim in the petition for review in the state supreme court). Alvarez would face multiple procedural bars if he were to return to the state courts with the unexhausted claims of ineffective assistance of trial counsel. *See, e.g.*, NRS §§ 34.726; 34.810. Ground 4 is therefore procedurally defaulted. *See Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (noting a new claim that is procedurally defaulted is "technically exhausted"). The Court will thus consider whether the default may be overcome under *Martinez*.[10]

### 2. *Martinez* Analysis

#### a. Additional Background

On August 20, 2009, an anticipatory search and seizure warrant authorized the search of

---

[10] The Court will consider whether Alvarez has overcome the procedural default under *Martinez* because, at some point during these proceedings, each party addressed the *Martinez* issue for Ground 4.

"any vehicle driven or occupied by" Alvarez "upon occurrence of the triggering event," as follows:

> JOSE making contact via telephone with KELLY advising JOSE was in Fallon, Churchill County and / or JOSE, a Hispanic male approximately 5'9" 185[]lbs, black hair brown eye[s] arriving at 60 South Allen Road, Budget Inn Fallon Churchill County Nevada exiting his vehicle a light silver Chevrolet Tahoe bearing California plates or other vehicle and entering Room #135.

(ECF No. 16-5 at 55.) Upon the above triggering events, the warrant authorized a search for "[a]ny and all items used in or associated with the crimes of: Unlawful possession of a Schedule I (one) Controlled Substance in violation of NRS Chapter 453.336; Trafficking Controlled Substance Schedule I in violation of NRS 453.385, and Conspiracy in violation of NRS 453.401." (*Id.* at 56.) The items to be seized included "[c]ontrolled substance(s) . . ." and:

> (2) [R]ecords, and any other documents related to the purchase, or sale of controlled substances, including the identities of individuals and the amounts owed for the sales or purchases of controlled substances by those individuals, including computer hardware or other computer media or devices which could contain such information, such as . . . cellular telephones or personal data devices.
>
> (3) Limited items of personal property which would tend to establish a possessor[']s interest in the items seized pursuant to this search warrant, such as identification . . . or other electronic recordings . . . or other logs or records, specifically indicia of vehicle or occupancy ownership. Telephones and address books, cellular telephones and any incoming telephone calls or information received at the time of the execution of this warrant.

(*Id.*)

In his handwritten *pro se* state postconviction petition, Alvarez asserted trial counsel was ineffective in failing to move to suppress evidence based on the invalid warrant and the "unauthorized actions of law enforcement," and attached copies of the anticipatory search and seizure warrant and the application and affidavit in support of the issuance of the warrant. (*Id.* at 39–41, 46–57.) The state district court held an evidentiary hearing at which Alvarez testified he asked trial counsel to file a motion to suppress because, among other things, "triggering events on the search warrant," i.e., "[g]etting out of [his] vehicle and going into room 135" at the motel, did not occur. (ECF No. 17-6 at 43.) Trial counsel testified a motion to suppress was discussed with Alvarez and, although the triggers for authorization of the anticipatory warrant were unfulfilled, counsel did not believe a motion to suppress based on "blocking [of Alvarez's exit from the motel parking lot] being a stop" was appropriate because "there was no search at that point" so there was "nothing to suppress." (*Id.* at 8–9.) Trial counsel explained a motion to suppress the

methamphetamine as fruit of an unlawful attempted stop at the motel was not considered due to the events that occurred after the attempted stop:

> Q    [H]ad you thought about running a theory that if that stop doesn't happen, the drugs don't come out of the car later, and therefore everything after the stop should have been suppressed because the original take down was in violation of the Fourth Amendment because the search warrant hadn't been able to be executed at that point because the precursors didn't exist?

> A    No.

> Q    Okay. Is that why you didn't file the motion?

> A    Using your theory, which I—never occurred to me and never was— I never discussed that theory with Mr. Alvarez at any time, I didn't file a Motion to Suppress because there were too many other factors that had occurred between this attempted stop and the location of the drugs.

> There was a lot of time and space between those two things, and there were a number of other events that occurred that could have led to the—to this—well, the drugs were in plain sight at that point, so the discovery of the drugs was not the issue, so to—if you're asking me did I consider a Motion to Suppress to suppress the chase, no, I didn't consider that.

(*Id.* at 13–14.)

### b.    Legal Principles

The Fourth Amendment of the Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975) (citations omitted). The Supreme Court has "held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The reasonable suspicion standard considers "the totality of the circumstances—the whole picture." *Id.* at 7–8. This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *Id.* "Reasonable suspicion, like probable cause, is dependent upon both the

content of information possessed by police and its degree of reliability." *Alabama v. White,* 496 U.S. 325, 330 (1990).

Officers may search a vehicle and any containers found therein without a warrant, so long as they have probable cause to believe the vehicle contains evidence of a crime. *See, e.g.*, *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999) (contraband goods concealed and illegally transported in an automobile or other vehicle may be searched for without a warrant where probable cause exists); *California v. Acevedo,* 500 U.S. 565, 580 (1991) (holding police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained); *United States v. Robinson*, 414 U.S. 218, 233–34 (1973) (holding where officer had probable cause to arrest defendant for traffic violation, search of defendant and inspection of crumpled cigarette package found on defendant's person and seizure of heroin capsules found inside that package were permissible); *Carroll v. United States,* 267 U.S. 132, 153–54 (1925) (holding search of vehicle appropriate because police had probable cause to believe vehicle contained contraband liquor). The Supreme Court has held, however, that a warrant must be secured before searching the contents of a cellular telephone. *Riley v. California*, 573 U.S. 373, 442–43, 446–51 (2014).

"Probable cause exists where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76 (1949) (citing *Carroll,* 267 U.S. at 162.) For purposes of determining whether police had probable cause, the reliability of an informant's tip must be considered under the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230–32 (1983); *see e.g.*, *United States v. Ochoa*, 667 F.3d 643, 649–50 (5th Cir. 2012) (holding police had probable cause to arrest defendant for drug trafficking where they listened to call arranging sale of cocaine, observed defendant in parking lot where controlled drug delivery was to occur, defendant arrived shortly after call arranging delivery, defendant drove a car up behind the supplier's car, defendant and supplier used code names to identify one another, and the supplier signaled the officers that defendant was his contact); *United States v. Gill*, 685 F.3d 606, 609–10 (6th Cir. 2012) (holding

police had probable cause to arrest defendant, where informant told police defendant previously sold him drugs, informant arranged by phone in presence of police to buy cocaine from defendant at a certain location, informant told police defendant told him the car he would be driving, defendant arrived at the location driving that car, defendant fled on foot when officers identified themselves and was observed dropping a set of keys, and defendant stopped his flight only after being repeatedly commanded to stop on public street); *U.S. v. Steppello*, 664 F.3d 359, 363–65 (2d Cir. 2011) (holding warrantless arrest lawful because officer had probable cause based on being present when buyer called defendant to arrange cocaine purchase, knew defendant called buyer's cell phone while waiting for transaction, and arrested defendant in buyer's driveway).

Where a petitioner claims that the deficient performance of counsel was failure to make a suppression motion, "a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim" *Kimmelman v. Morrison,* 477 U.S. 365, 382 (1986).

### c.   Discussion

Alvarez cannot overcome the procedural default of his claims in Ground 4 as, based on the state court record, there is no merit to the claim that trial counsel's failure to move to suppress evidence was either deficient or prejudicial under *Strickland*.

It is true that law enforcement was not authorized to act under the authority of the anticipatory warrant because the events that would have triggered authorization to act under that warrant did not occur; however, the invalidity of the warrant did not preclude law enforcement from lawful action under exceptions to the warrant requirement. The facts in the state court record demonstrate law enforcement had reasonable suspicion to stop and detain Alvarez and probable cause to arrest Alvarez and search his vehicle when Alvarez arrived at the motel and when Alvarez stopped his vehicle following his flight from police.

Police had reliable information that Alvarez was the person who promised to meet Kelly at the motel room and was supplying him with a pound of methamphetamine. Those facts included: (1) controlled purchases of methamphetamine from Kelly prior to enlisting Kelly's cooperation to give up Alvarez, whom he identified as his methamphetamine supplier; (2) Kelly's phone calls to Alvarez on Guerra's telephone arranging for delivery of a pound of methamphetamine so that

Kelly could sell it; (3) Guerra's acquisition of the details of the delivery by eavesdropping on Kelly's conversations with Alvarez; (4) Guerra's receipt of a text message from the same number that Kelly used to call Alvarez to arrange for the supply of methamphetamine; (5) Guerra's receipt of a voicemail message from a man with a voice similar to the voice Guerra heard arranging to supply Kelly with methamphetamine; (6) Alvarez's arrival at the agreed-upon location and appointed time; (7) Alvarez's parking his vehicle in front of the designated motel room and honking his horn to communicate his arrival; and (8) Kelly's immediate identification of Alvarez at the motel parking lot. Thus, even before police stopped Alvarez at the motel, they had probable cause to stop and arrest him, and search his vehicle. The existence of probable cause to arrest Alvarez and search his vehicle for evidence of supplying methamphetamine to Kelly increased when Alvarez demonstrated consciousness of guilt by (1) immediately fleeing from three law enforcement officers, two in marked police vehicles, and all three with lights and sirens activated; (2) ignoring Officer Jones's command to stop and hitting Officer Jardine's vehicle as he exited the motel parking lot; (3) engaging police in an extended vehicle chase during which he ignored Undersheriff Woods's flashing lights and siren and command to stop; and (4) colliding with Captain Haugen's vehicle before continuing to evade capture by exiting the Tucker property.

Alvarez's contention that trial counsel was ineffective in failing to move to suppress the line of methamphetamine seized from the Tucker property based on a theory of "forced abandonment" is without merit because Alvarez abandoned the methamphetamine before he was lawfully seized. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding that even if officer's pursuit of defendant on suspicion of narcotics transaction was a "show of authority," cocaine abandoned by defendant while he was running was not fruit of subsequent seizure and was not subject to exclusion).

Alvarez fails to establish a substantial claim that trial counsel was ineffective in failing to move to suppress the seizure of the mobile telephone found in Alvarez's vehicle. Law enforcement had specific articulable facts that put them on notice that Alvarez used a mobile phone to communicate with Kelly in arranging to supply the methamphetamine and to communicate with Kelly several times en route to the motel, e.g., regarding the failure of Alvarez's global positioning

system to locate the motel. *See infra*, n.11. Under the circumstances, law enforcement was aware that Alvarez's mobile phone was evidence of a crime as he used it to arrange to supply the methamphetamine to Kelly and to communicate the details of the delivery. Law enforcement was also aware that Alvarez drove the Acura to supply methamphetamine to Kelly. Thus, law enforcement had probable cause to seize the mobile phone from the driver's side console of Alvarez's vehicle.

Detective Guerra testified to a mistaken belief that he could search the contents of Alvarez's mobile telephone pursuant to the warrant.[11] Nonetheless, Alvarez fails to demonstrate a substantial claim that trial counsel was ineffective in failing to move to suppress the contents, i.e., the recent call list, as there was no reasonable probability a motion to suppress the cellular telephone contents would have been successful. At the time of trial counsel's representation of Alvarez in 2010, the Supreme Court had not yet decided *Riley.* And at that time, there existed case law holding that warrantless searches of the contents of a cellular telephone were lawful provided the seizure of the telephone was lawful and the search of the contents was contemporaneous with the seizure of the telephone, as it was in Alvarez's case. *See* Adam M. Gershowitz, *The Iphone Meets the Fourth Amendment*, 56 UCLA L. Rev. 27, 58 (2008) (citing cases approving warrantless

---

[11] Detective Guerra testified he provided Guerra a copy of the [invalid] anticipatory warrant when he arrested him, searched the Acura, discovered a mobile phone in the driver's side console, and reviewed the recent calls on the phone which revealed a recent call to Guerra's phone:

| Q | Okay. What did you find in the vehicle? |
|---|---|
| A | As per our search warrant, I was able to collect any electronic devices, including PDAs, cellphones, things of that nature. I found the Boost Mobile phone right in the console area of the driver's side—near the driver's side. |
| Q | Did you look at that phone? |
| A | I did look at that phone, and in that, more specifically the recent calls of that phone. My number to my work cell phone was listed. |
| Q | Okay . So that's the number that was used by Mr. Kelly to call the person known as Jose? |
| A | Yes. Just prior to him getting there and us doing the takedown, I had fielded several communications between Sergeant Pabon's vehicle where Kelly was at. And the last one was that his GPS wasn't showing the Budget Inn, that he was making a U-turn at— |
| Q | Without getting into that. |
| A | All right. |
| Q | So there was a recent phone call from the phone you found in that vehicle to your cellphone, the same cellphone that Mr. Kelly used? |
| A | Yes. It listed my work cellphone number in his last recent calls. |

(ECF No. 76-10 at 15–16.)

searches of the contents of cellular telephones before *Riley*); *see also, e.g., United States v. Finley*, 477 F.3d 250, 260 (5th Cir. 2007) (holding permissible the seizure and search of call records and text messages on cellular phone contemporaneous with arrest during traffic stop); *but see United States v. Park*, No. CR 05-375SI, 2007 WL 1521573, at 1 (N.D. Cal. May 23, 2007) (concluding officers who seized defendants' cellular phones at the station house an hour and a half after arrest, were required to obtain warrants to search the contents of those phones).[12] For the foregoing reasons, Alvarez cannot establish a substantial claim that trial counsel's performance in failing to move to suppress the evidence fell below an objective standard of reasonableness for attorneys in criminal cases or that there is a reasonable probability a motion to suppress would have been successful. Because Alvarez fails to establish a substantial claim that trial counsel was ineffective in failing to move to suppress the evidence, he fails to overcome the procedural default of that claim. Ground 4 will be dismissed as procedurally defaulted.

### C.    Ground 5

Ground 5 asserts that trial counsel was ineffective for failing to object to the prosecutor's use of certain words and phrases during closing arguments suggesting the prosecutor had personal knowledge of the investigation, i.e., use of the terms "I submit," "We submit," "we," and "our" when referring to the State and law enforcement interchangeably and for vouching concerning witness credibility.[13] (ECF No. 34 at 20–25.) The parties agree the claims in Ground 5 are technically exhausted because Alvarez did not raise them in the state courts, and they would be

---

[12] Assuming trial counsel could have successfully moved to suppress the contents of Alvarez's mobile phone that showed recent calls to Guerra's telephone, there is no reasonable probability the result of the trial proceedings would have been different without that evidence. It was inconsequential that the mobile phone within Alvarez's reach in his vehicle included a record of calls to Guerra's telephone because Kelly and Guerra each testified about the fact, timing, and substance of the calls between Kelly and Alvarez and the direct and circumstantial trial evidence demonstrated Alvarez was the person supplying methamphetamine to Kelly when Alvarez arrived at the motel. Moreover, Alvarez's flight and actions in evading the police and disposing of the methamphetamine increased the reliability of the evidence that Alvarez was the supplier of the methamphetamine. Nothing in the record indicates counsel's performance rendered Alvarez's trial unfair or that the verdict is unreliable.

[13] The majority of the Ninth Circuit panel held this claim is contained in Ground 2 of the original petition, and the details supporting this claim are contained in the state district court's order attached to the original petition. *Alvarez v. Neven*, No. 18-15516, 2021 WL 4922550, at 2 (9th Cir. Oct. 21, 2021).

procedurally defaulted if he attempted to return to state court to present them. (ECF Nos. 34 at 20; 67 at 24–28; 74 at 28–33); *see Dickens,* 740 F.3d at 1317.

### 1.    Additional Background

At the state postconviction evidentiary hearing, trial counsel testified a strategic decision was made to utilize evidence that the prosecutor was personally present when the methamphetamine was collected from the Tucker driveway to argue the police work was "shoddy" because the prosecutor was "tromping through the location where the drugs" were found. (ECF No. 17-6 at 15–16.) Trial counsel testified to familiarity with federal cases on the impropriety of indirect testimony by a prosecutor in closing arguments but explained that, aside from the objections made, there was no other basis to object to the prosecutor's closing remarks:

> A    [I] kept a close eye and ear on [the prosecutor] during closing so that he wasn't saying well, I saw, or I was there, or that was—this was what you could see.
>
> So I was very diligent knowing that he had been there so he wouldn't be communicating that to the jury.

(*Id.* at 17–18.) Appellate counsel testified at the postconviction evidentiary hearing that there was no merit to a claim of prosecutorial misconduct:

> Q    [D]id you raise the issue of [the prosecutor] providing indirect testimony not subject to cross examination?
>
> A    No, I did not, because it—it clearly was not such a situation.
>
> Q    So you admit you would have raised it under a plain error analysis; is that correct?
>
> A    If I believed that there had been a misstatement by a prosecutor that rose to the level of prosecutorial misconduct, I absolutely would have, and the record should note that I have litigated many cases, jury trials against [the prosecutor].
>
> I have never hesitated to object if I felt he made a misstatement in closing argument, but in the closing argument in this case I did not see anything that would have warranted any objections.
>
> Q    So with regards to [the prosecutor] . . . providing indirect testimony not subject to Cross, what would have been the likelihood of success on appeal?
>
> . . . .

A       The success of such an argument would have, in my opinion, been next to zero.

[T]here was no basis for an argument to make that kind of comment on the . . . prosecutor's argument because he was within the scope of his argument, and the jury was properly instructed that statements of Counsel are not evidence.

(*Id.* at 57–58.)

## 2.       Legal Principles

To warrant habeas relief, acts of prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The standard is general, leaving courts "leeway in reaching outcomes in case-by-case determinations . . ." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated two dangers are posed when a prosecutor vouches for the credibility of a witness and expresses a personal opinion on the guilt of the accused: (1) "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"; and (2) "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (citation omitted).

To determine whether a prosecutor's comments rise to the level of a due process violation, courts examine the prosecutor's remarks in context based on the entire proceedings. *See Boyde v. California*, 494 U.S. 370, 385 (1990) (citations omitted); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Factors to consider when determining whether a prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence

of the comment in the context of the entire trial; and (6) the weight of the evidence. *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

For purposes of determining whether the prosecution engaged in misconduct in the form of vouching for a witness, the Ninth Circuit has stated a court considers the following factors: (1) the form of vouching; (2) how much the vouching implies the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; (3) any inference the court is monitoring the witness's veracity; (4) the degree of personal opinion asserted; (5) the timing of the vouching; (6) the extent to which the witness's credibility was attacked; (7) the specificity and timing of a curative instruction; and (8) the importance of the witness's testimony and the vouching to the case overall. *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15, 1993).

### 3.    Discussion

Alvarez claims trial counsel was ineffective in failing to object to the prosecutor's use of the phrases "we would submit to you," and "I would submit to you," and use of the word "we" and "our" to refer to the State and law enforcement interchangeably because it gave the appearance the prosecutor, whom the jury was informed had visited the scene of the recovery of the methamphetamine, had personal knowledge of the events. Based on the context of the prosecutor's argument, these contentions fail to establish a substantial claim of ineffective assistance of trial counsel for purposes of overcoming procedural default under *Martinez*.

Defense counsel was aware the prosecutor attended the scene at the Tucker property. Counsel was alert during closing remarks for any argument conveying to the jury that the prosecutor had personal knowledge that vouched for the State's case. Counsel moreover objected when the prosecutor's closing remarks arguably vouched for Tucker's credibility. *See infra* at p. 29. In the context of the prosecutor's argument, the use of "we submit" or "I submit," conveyed only what the prosecutor argued or contended based on inferences that could be drawn from the evidence. *See, e.g.*, *Necoechea,* 986 F.2d at 1279 (holding "I submit that . . ." arguments were legitimate suggestions of permissible inferences, not vouching). According to the record, the prosecutor's statements neither made a reference to extra-record facts nor implied the prosecutor

or any of the State's witnesses was monitoring the truthfulness of the witnesses. The prosecutor's "I submit" statements did not function as an impermissible personal guarantee of credibility of any witnesses or evidence. Indeed, defense counsel used the same or similar rhetorical devices in defense closing remarks when counsel used the phrases "I'd submit to you" and "we," "we're," and "we know" throughout the defense closing argument to draw inferences based on the evidence. (ECF No. 76-11 at 40–46.) Defense counsel's failure to object to the prosecutor's similar remarks was a reasonable tactical decision on the face of the record. Given that the prosecutor's remarks exhibited no unfairness in the context of the argument, an objectively reasonable attorney could refrain from objecting to the prosecutor's use of such rhetorical devices. Even if isolated instances of the prosecutor's argument could be construed as personal opinion about the evidence, the state district court instructed the jury that the statements and opinions of the attorneys were not evidence and could not be considered as such in determining the verdict.[14] *See Weeks v. Angelone*, 528 U.S. 225, (2000) ("A jury is presumed to follow its instructions.").

Alvarez claims trial counsel was ineffective in failing to object to the prosecutor's argument offering "his opinion on the [lack of] credibility" of defense witness Black when the prosecutor argued "that Black could not be observed in any of the videos of the incident and then stated, "Ladies and gentlemen, I would suspect that his claim that he was there is unreasonable." (ECF No. 74 at 27.) There is no merit to the claim that trial counsel's failure to object was deficient or prejudicial. The prosecutor's argument was invited by defense counsel's argument about Black's credibility and the videos presented in evidence depicted Alvarez's chase and arrest. Thus,

---

[14] Alvarez's reliance on *Berger v. U.S.,* 295 U.S. 78, 88 (1935) is misplaced. (ECF No. 74 at 31.) In *Berger* the Supreme Court confronted a case in which prosecutorial misconduct was not "slight or confined to a single instance," but was "pronounced and persistent, with a probable cumulative effect upon the jury" that could not be disregarded as inconsequential because the prosecutor:

> [W]as guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and, in general, of conducting himself in a thoroughly indecorous and improper manner.

*Id.*, 295 U.S. at 84. The prosecutor in Alvarez's case behaved in none of those ways.

the prosecutor's argument was based on inferences to be drawn from the evidence. Nothing in the prosecutor's argument purports to vouch for Black's lack of credibility. There is no merit to the claim that trial counsel's failure to object fell below an objective standard of reasonableness for attorneys in criminal cases.

There is likewise no merit to Alvarez's claim that the prosecutor personally vouched for the credibility of prosecution witness Tucker. (ECF No. 74 at 27.) Trial counsel objected to the prosecutor's statement, "But what do we know from Ms. Tucker who has absolutely no motive to gain," as improperly "verifying the credibility of a witness." (ECF No. 76-11 at 48.) The state district court sustained the objection and instructed "Members of the jury, you'll strike that. I'm going to strike that last argument. You're not to pay any attention to it." (*Id.*) Trial counsel's failure to object to the prosecutor's follow-up argument, "What motive does she have to get up there and tell you anything but the truth? The State would submit to you, she has none," was not only invited by defense counsel's closing argument about Tucker's credibility, but it also directed the jury to draw inferences from the evidence. Nothing in the remark indicates the prosecutor had any extra-judicial knowledge that Tucker was truthful or that the prosecutor was placing the prestige of the Government behind Tucker's truthfulness.

For the foregoing reasons, Alvarez fails to establish a substantial claim of ineffective assistance of trial counsel to overcome his procedural default of the claim and Ground 5 will be dismissed.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Alvarez. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). For entitlement to a COA for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). When a district court denies relief on procedural grounds, the petitioner seeking

a COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012); *Slack*, 529 U.S. at 484.  Based on these standards, the Court finds a COA is not warranted for any of the grounds raised in the Petition as reasonable jurists would not find the Court's rulings or assessments either debatable or wrong.

## VI.   CONCLUSION

**IT IS THEREFORE ORDERED:**

1.   Ground 2 of the Petition is DENIED. Grounds 4 and 5 of the Petition are DISMISSED with prejudice as procedurally defaulted. The Petition (ECF No. 34) is DENIED with prejudice;

2.   A Certificate of Appealability is DENIED;

3.   All requests for an evidentiary hearing are DENIED;

4.   The Clerk of Court is directed to substitute Brian Williams for Respondent Dwight Nevens; and

5.   The Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED this ___ 25th day of May    2023.

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE